WO

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Anthony H. Jones,<br><br>              Plaintiff,<br><br>v.<br><br>Colorado Casualty Insurance Company, et al.,<br><br>              Defendants. | No. CV-12-01968-PHX-JAT<br><br>**ORDER** |

Before the Court is Defendant's motion for summary judgment. (Doc. 121). The Court now rules on the motion.

**I.    Background**

In February of 2010, while working for Best Glass, Inc., Plaintiff Anthony Jones ("Plaintiff") was involved in an auto accident. (Defendant's Statement of Facts, Doc. 122 ("DSOF") at ¶ 1; Plaintiff's Response to Defendant's Statement of Facts, Doc. 127 ("PRDSOF") at ¶ 1). Plaintiff initially treated with his personal chiropractor, Dr. Widoff, for the injuries he suffered in the accident, after which he was referred to an orthopedic surgeon, Dr. Sumit Dewanjee. (DSOF at ¶¶ 2, 3; PRDSOF at ¶¶ 2, 3). Dr. Dewanjee created a report of his July 23, 2010 visit with Plaintiff, in which he recorded that Plaintiff was a candidate for arthroscopic surgery. (DSOF at ¶ 4; PRDSOF at ¶ 4).

1   Best Glass reported the injury to its workers' compensation insurer, Defendant
2  Colorado Casualty Insurance Company, on July 29, 2010. (DSOF at ¶ 5; PRDSOF at
3  ¶ 5). Defendant assigned adjuster Trudy Spratta to handle the claim. (DSOF at ¶ 6;
4  PRDSOF at ¶ 6). On September 16, 2010, Ms. Spratta scheduled an Independent Medical
5  Examination ("IME") with Dr. David Bailie, which Plaintiff attended on October 6, 2010.
6  (DSOF at ¶ 14; Plaintiff's Statement of a Facts, Doc. 128 ("PSOF") at ¶¶ 13, 14).

7   After reviewing Plaintiff's medical records and examining Plaintiff, Dr. Bailie
8  recommended Plaintiff undergo "conservative treatment" of physical therapy and
9  injections for two months and then be reevaluated for surgery if he has not reached
10 maximum medical improvement ("MMI"). (DSOF at ¶ 7; PRDSOF at ¶ 7; PSOF at
11 ¶¶ 15–16).

12  Ms. Spratta provided Dr. Bailie's October 6, 2010 report to Dr. Dewanjee and
13 Plaintiff. (DSOF at ¶ 8; PRDSOF at ¶ 8; PSOF at ¶ 17). Ms. Spratta authorized the
14 conservative treatment recommended by Dr. Bailie and declined to authorize surgery.[1]
15 (DSOF at ¶ 8; PRDSOF at ¶ 8; PSOF at ¶ 17, 19). Plaintiff began physical therapy on
16 December 17, 2010. (DSOF at ¶ 8; PRDSOF at ¶ 8). Plaintiff returned to see Dr.
17 Dewanjee on January 21, 2011, after which Dr. Dewanjee documented that Plaintiff
18 "elected"[2] to continue with the physical therapy. (DSOF at ¶ 9; PRDSOF at ¶ 9).
19 Dr. Dewanjee also recommended that Plaintiff undergo additional physical therapy
20 beyond what Dr. Bailie recommended. (DSOF at ¶ 10; PRDSOF at ¶ 10). Dr. Dewanjee's
21 clinic then requested authorization from Defendant for the additional physical therapy,
22 which was approved. (*Id.*).

---

[1] Plaintiff claims that the claims notes indicate that "if Dr. Dewanjee still requested surgery after the treatment regimen, [Defendant] would require another IME before accepting the claim." (PSOF at ¶ 18). But the part of the record Plaintiff cites is a section of the claims notes that merely quotes Dr. Bailie's IME report stating "If he does not [reach MMI], one would consider arthroscopy with debridement." (Doc. 128-6 at 1276).

[2] Plaintiff points out that his "election" to continue physical therapy was driven by Defendant's refusal to authorize surgery. (PRDSOF at ¶ 9).

Plaintiff completed physical therapy and was discharged from Dr. Dewanjee's clinic on April 8, 2011. (DSOF at ¶ 11; PRDSOF at ¶ 11). An April 14, 2011 claims note indicates that Ms. Spratta refused authorization for more physical therapy, instead telling Plaintiff that he must return to the surgeon for a recommendation. (PSOF at ¶ 22; Doc. 128-6 at 1218). Plaintiff returned to Dr. Dewanjee on April 29, 2011. (DSOF at ¶ 12; PRDSOF at ¶ 12). Dr. Dewanjee noted in his report of the visit that Plaintiff continued to have signs of impingement, mild pain over the biceps tendon, and tenderness over the acromioclavicular joint. (Doc. 124-1 at 532). Dr. Dewanjee discussed treatment options with Plaintiff and recommended the same surgery he originally recommended. (*Id.*). Plaintiff elected to proceed with the surgery. (DSOF at ¶ 12; PRDSOF at ¶ 12).

On May 5, 2011, Dr. Dewanjee issued a work status note taking Plaintiff off work until after surgery. (DSOF at ¶ 13; PRDSOF at ¶ 13). Best Glass received the note and sent it to Ms. Spratta on June 27, 2011. (*Id.*). Best Glass then terminated Plaintiff on May 13, 2011 because it could not accommodate Plaintiff's work restriction. (DSOF at ¶ 14; PRDSOF at ¶ 14; PSOF at ¶ 25). A claims note written by Ms. Spratta dated May 4, 2011 states that Defendant "would not be able to pay lost time" benefits. (Doc. 128-6 at 1282).

When Ms. Spratta received Dr. Dewanjee's report of the April 29 visit on May 4, 2011, she scheduled another IME with Dr. Bailie for May 25, 2011. (DSOF at ¶ 15; PRDSOF at ¶ 15). After rescheduling the IME several times, Plaintiff filed a motion with the Industrial Commission of Arizona ("ICA"), requesting a protective order barring the IME. (DSOF at ¶ 17; PRDSOF at ¶ 17; Doc. 123-1 at ICA SDT 00037). An ICA Administrative Law Judge ("ALJ") denied Plaintiff's motion and directed Plaintiff to attend the IME on June 22, 2011. (Doc. 123-1 at ICA SDT 00037).

On May 6, 201, while the parties were litigating the IME issue at the ICA, Plaintiff filed a "worker's report of injury" form with the ICA. (Doc. 123-1 at ICA SDT 00029). Defendant accepted Plaintiff's disability claim on June 7, 2011 and began issuing checks to Plaintiff for disability benefits at about the same time. (DSOF at ¶¶ 14, 19; PRDSOF at ¶¶ 14, 19).

1    Plaintiff obeyed the ICA's directive and attended the IME on June 22, 2011,[3] after
2 which Dr. Bailie recommended a different surgery than Dr. Dewangee. (PSOF at ¶ 29;
3 Defendant's Response to Plaintiff's Statement of Fact ("DRPSOF"), Doc. 132, at ¶ 29;
4 Doc. 128-11). Specifically, Dr. Dewangee had recommended "a SLAP labral tear, distal
5 clavicle excision, and subacromial decompression," (Doc. 124-1 at 532), while Dr. Bailie
6 recommended "bicep tenodesis . . . instead of a labral repair," (*Id.* at 534). A claims note
7 dated July 1, 2011 states, "Dr. Bailie indicates [Plaintiff] should have arthroscopic
8 surgery with biceps tenodesis or tenotomy. I am investigating if we can limit the surgery
9 to this procedure or will have to authorize a labral repair." (Doc. 128-6 at 1301–02; PSOF
10 at ¶ 35; DRPSOF at ¶ 35).

11   Ms. Spratta then sent Dr. Bailie's report to Dr. Dewangee on July 20, 2011,
12 requesting that Dr. Dewangee review it and "let me know if he agrees." (Doc. 124-1 at
13 536). Dr. Dewangee sent a report back to Ms. Spratta detailing an August 19, 2011
14 appointment with Plaintiff and recommended the surgery he initially recommended.
15 (Doc. 123-1 at SDT 00027; Doc. 124-1 at 1285; *see also* Doc. 123-1 at 42:8–43:24).

16   Ms. Spratta then scheduled another IME to, in Defendant's words, "break the tie"
17 between Dr. Dewanjee's opinion and Dr. Bailie's opinion. (DSOF at ¶ 21; PRDSOF at
18 ¶ 21; PSOF at ¶¶ 35, 38). Dr. Neal Rockowitz was selected to perform this third IME,
19 which took place on September 29, 2011. (DSOF at ¶¶ 22, 23; PRDSOF at ¶¶ 22, 23;
20 PSOF at ¶¶ 35, 38, 41). Dr. Rockowitz concluded that Plaintiff was stationary, without
21 permanent injury, and in no need of surgery.  (DSOF at ¶ 23, PRDSOF at ¶ 23; PSOF at
22 ¶¶ 43, 44).

23   Defendant states that on October 7, 2011, it "received a call from a member of
24 Plaintiff's family, reporting that Plaintiff had not been injured at work and that he was

---

[3] For some reason, Defendant implies that Plaintiff did not appear at the June 22 IME. *See* PSOF at ¶ 17 ("Instead of appearing for his June 22nd IME, Plaintiff tried to prevent the IME altogether."). The Court found no evidence of this in the record. Indeed, in its response to Plaintiff's statement of facts, Defendant admits that "Dr. Bailie's report is dated June 22, 2011." (DRPSOF at ¶ 29).

- 4 -

lying about his claim."[4] (DSOF at ¶ 24). Based on these phone calls and Dr. Rockowitz's recommendation, Defendant issued a "Notice of Claim Status" form, terminating Plaintiff's worker's compensation benefits on November 7, 2011. (DSOF at ¶ 28; PSOF at ¶ 48). On November 14, 2011, Plaintiff filed a Request for Hearing with the ICA, claiming that his condition was not permanent and stationary and that, if he were stationary, he has suffered a permanent disability. (DSOF at ¶ 29; PRDSOF at ¶ 29; PSOF at 49; Doc. 123-1 at ICA SDT 00051). Plaintiff also requested a subpoena to compel the testimony of Drs. Dewanjee and Bailie at the hearing. (DSOF at ¶ 29; PRDSOF at ¶ 29; Doc. 123-1 at Exhibit 11, SDT 00023).

Defendant then decided to have Dr. Bailie conduct yet another IME on Plaintiff.[5] The IME was originally scheduled for January 18, 2012, but it was rescheduled to March 14, 2012 when Plaintiff arrived late. (DSOF at ¶ 32; PRDSOF at ¶ 32; PSOF at ¶ 50). Dr. Bailie recommended "arthroscopy with biceps tenodesis" because "the chance of healing a labral tear in a smoker is significantly decreased." (DSOF at ¶ 33; PRDSOF at ¶ 33; Doc.124-1, Exh. 11 at CCAS 212–13). He qualified his recommendation somewhat, stating that "[i]t depends on the findings at the time of surgery" because "if it is a clear-cut type of labral tear, then it may be repaired." (*Id.*).

Defendant then rescinded its claim closure on May 3, 2012, began paying temporary disability benefits, and authorized the surgery recommended by Dr. Bailie. (DSOF at ¶ 34; PRDSOF at ¶ 34). Dr. Dewanjee performed Plaintiff's surgery on May 24, 2012. (DSOF at ¶ 35; PRDSOF at ¶ 35; PSOF at ¶ 55).

---

[4] Plaintiff objects that this is hearsay and Defendant invokes the present sense impression and business records exceptions to the rule against hearsay. (PRDSOF at ¶ 24; Defendant's Reply to Plaintiff's Response to Defendant's Statement of Facts ("DRPRDSOF"), Doc. 131, at ¶ 24). Because the Court does not rely on these facts in its holding, it need not resolve this evidentiary question at this stage in the proceedings.

[5] Defendant claims that it subjected Plaintiff to this IME "based upon Plaintiff's objection to Colorado Casualty's November 7, 2011 Notice of Claim Status ending benefits and Plaintiff's request for testimony from Dr. Bailie." (DSOF at ¶ 30). However, the claims note Defendant cites for this proposition does not mention Plaintiff's subpoena request as a reason for the IME. (See 124-1 at Exh. 12, CCAS 1303).

## II. Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A)&(B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. To be entitled to summary judgment, the movant must support its motion with evidence that would entitle it to a directed verdict at trial, *id.* (citing Fed. R. Civ. P. 50(a)); i.e., the party must show that "a reasonable jury would not have sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). The burden then shifts to the non-movant to establish the existence of material fact. *Celotex Corp.*, 477 U.S. at 323. The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a *genuine* issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a

1 motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

**III.  Bad Faith**

### A.  Legal Standard

"The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'" *Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279-80 ¶ 20 (Ariz. 2000) (quoting *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (1981)). The tort recognizes that "in buying insurance[,] an insured usually does not seek to realize a commercial advantage but, instead, seeks protection and security from economic catastrophe." *Rawlings v. Apodaca*, 726 P.2d 565, 570 (Ariz. 1986). However, "[b]ecause of the disparity in bargaining power and the nature of the contract, the insurer receives both premium and control." *Id.*

In the case of first-party insurance, "the insurer sets the conditions for both presentment and payment of claims." *Id.* This dual role gives the insurer "an almost adjudicatory responsibility." *Id.* "Although the insured is not without remedies if he disagrees with the insurer, the very invocation of those remedies detracts significantly from the protection or security which was the object of the transaction." *Id.* Thus, the contract between insurer and insured gives rise to the insurer's obligation "implicit in the contract and the relationship . . . to play fairly with its insured." *Id.*; *see also Zilisch*, 995 P.2d 279-80 ¶ 20 (an insurer owes its insured duties of equal consideration, fairness, and honesty). Accordingly, an insurer may be liable for bad faith even if it has not breached an express covenant of the insurance contract. *See Deese v. State Farm Mut. Auto. Ins. Co.*, 838 P.2d 1265, 1270 (Ariz. 1992).

An insured alleging a bad faith claim against his insurer must show (1) the insurer acted unreasonably and (2) the insurer knew or recklessly disregarded the fact that its conduct was unreasonable. *Zilisch*, 995 P.2d at 280 ¶ 22; *Noble*, 624 P.2d at 868. "The first prong of the test for bad faith is an objective test based on reasonableness. The

1 second prong is a subjective test, requiring the plaintiff to show that the defendant
2 insurance company committed consciously unreasonable conduct." *Milhone v. Allstate*
3 *Ins. Co.*, 289 F. Supp. 2d 1089, 1094 (D. Ariz. 2003) (citing *Trus Joist Corp. v. Safeco*
4 *Ins. Co.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986)).

5 In *Zilisch*, the Arizona Supreme Court confirmed that two types of insurer
6 misconduct may give rise to a bad faith claim. First, an insurer may be liable for bad faith
7 if it denies a claim that was not fairly debatable. *Zilisch*, 995 P.2d at 280 ¶ 22; *see also*
8 *Deese*, 838 P.2d at 1269. The question of whether an insurer believed the claim to be
9 fairly debatable is generally a fact question for the jury, although a court may rule on the
10 issue as a matter of law "[i]f the plaintiff offers no significantly probative evidence that
11 calls into question the defendant's belief in fair debatability." *Young v. Allstate Ins. Co.*,
12 296 F. Supp. 2d 1111, 1116 (D. Ariz. 2003); *see also Bronick v. State Farm Mut. Auto.*
13 *Ins. Co.*, 2013 WL 3716600, at *6 (D. Ariz. July 15, 2013).

14 Second, an insurer is liable for bad faith if it acted unreasonably in processing a
15 claim, regardless of the claim's merits. *Zilisch*, 995 P.2d at 280 ¶ 22 ("[I]f an insurer acts
16 unreasonably in the manner in which it processes a claim, it will be held liable for bad
17 faith 'without regard to its ultimate merits.'" (quoting *Deese*, 838 P.2d at 1270)). Thus,
18 an insurer commits bad faith if during the "investigation, evaluation, and processing of
19 the claim, the insurer acted unreasonably and either knew or was conscious of the fact
20 that its conduct was unreasonable." *Id.*

21 **B.    Discussion**

22 As the facts recited above make clear, the dispute in this case largely surrounds the
23 multiple IMEs scheduled by Defendant and attended by Plaintiff. Defendant contends
24 that it acted reasonably because each IME it scheduled was supported by a legitimate
25 reason. Plaintiff, on the other hand, argues that Defendant abused the IME process in
26 order to avoid paying for a surgery.

27 The Arizona Courts have weighed in on this topic. For example, recently, the
28 Arizona Court of Appeals stated that "[a]lthough an insurer is entitled to seek an

independent medical examination to ensure surgery is necessary, it may not use the process to breach the implied covenant of good faith and fair dealing." *Bennett v. Ins. Co. of State of Pennsylvania*, No. 1 CA-CV 10-0815, 2012 WL 424913, at *3 (Ariz. Ct. App. Feb. 9, 2012) (internal quotation marks omitted) (quoting *Mendoza v. McDonald's Corp.*, 213 P.3d 288, 308 (Ariz. Ct. App. 2009).

In a case similar to this one, a judge in this District applied this principle to deny a self-insured employer's motion for summary judgment where the employer's claim notes stated that the purpose for scheduling an IME was to "limit the extent of the injury." *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1007 (D. Ariz. 2013) (Snow, J.). Judge Snow reasoned that although the employer presented evidence that the IME was scheduled for "permissible" reasons, a reasonable jury could also interpret the claims notes to mean that the employer acted "without reasonable or fairly debatable grounds." *Id.* (internal quotation marks, brackets, and ellipses omitted) (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 576 (1986)).

Defendant here, like the self-insured employer in *Demetrulias*, has offered evidence of reasonable justifications for each IME it scheduled. On the other hand, Plaintiff, like the injured employee in *Demetrulias*, has also presented evidence that Defendant was "doctor shopping" and making Plaintiff jump through procedural hoops rather than investigating a debatable claim. Most notably, Plaintiff points out a claims note which states that the claims adjuster was "investigating if we can limit the surgery to [the procedure recommended by the IME] or will have to authorize a labral repair [as recommended by Plaintiff's surgeon]." Additionally, there was still a "tie" after Dr. Rockowitz performed his IME, but Defendant accepted his recommendation without insisting on yet another "tie-breaker" IME. Indeed, even after Dr. Rockowitz recommended no further treatment, this opinion was contradicted by two other doctors, one of which (Dr. Bailie) was acting at Defendant's request. A reasonable jury could accept Plaintiff's interpretation of these facts and conclude that Defendant abused the

1  IME system. Therefore, the Court holds that there exists at least one[6] genuine issue of
2  material fact that precludes summary judgment on Plaintiff's bad faith claim.

### III. Punitive Damages

Punitive damages are appropriate "when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent." *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986) (citing *Anderson v. Continental Insurance Co.*, 271 N.W.2d 368, 379 (Wis. 1978)). In the context of an insurance bad faith claim, punitive damages may not be awarded "unless the evidence reflects 'something more' than the conduct necessary to establish the tort." *Id.* at 577 (citing *Farr v. Transamerica Occidental Life Insurance Co.*, 699 P.2d 376, 380 (Ct. App. 1984)). Thus, "[i]ndifference to facts or failure to investigate are sufficient to establish the tort of bad faith but may not rise to the level required by the punitive damage rule." *Id.* at 578. In addition to such indifference or failure to investigate, the plaintiff must also show that the insurer was "guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured." *Id.* Notably, however, circumstantial evidence is often the only way a plaintiff can prove she is entitled to punitive damages, since an insurer is rarely "willing to take the stand and admit its 'evil mind.'" *See Hawkins v. Allstate Ins. Co.*, 733 P.2d 1073, 1081 (Ariz. 1987). "Thus, whether the [insurer] intended to injure the plaintiff or consciously disregarded the plaintiff's rights may be suggested by a pattern of similar unfair practices." *Id.*

Defendant's argument here is simple: "Plaintiff cannot meet his burden, because he has not produced, nor can he, any evidence of intentional, fraudulent, aggravated or malicious acts, or any evidence of outrageous conduct." (Doc. 121 at 16). Although Defendant does not state as much, it presumably relies on the same explanations it gave in the context of Plaintiff's bad faith claim for the multiple IMEs it schedule. Similarly,

---

[6] The Court emphasizes that the genuine issues of material fact it finds in this Order do not necessarily represent an exhaustive list of issues that remain for trial.

- 10 -

1 Plaintiff relies on essentially the same evidence it presented in the bad faith context.

2 The Court agrees with Defendant; Plaintiff has failed to provide any evidence of the requisite "evil hand." Although Plaintiff has offered evidence that Defendant was abusing the IME system, there is no evidence that it did so with the intent to harm Plaintiff. Without evidence of "something more" than simple bad faith, no reasonable jury could conclude that Defendant's use of multiple IMEs was "aggravated, outrageous, malicious or fraudulent." *Rawlings*, 726 P.2d t 578.[7] Therefore, Plaintiff has failed to make out a prima facie case for punitive damages, and the Court will grant Defendant's motion for summary judgment as to Plaintiff's punitive damages claim.

## IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that Defendant's motion for summary judgment, (Doc. 121), is **DENIED IN PART** and **GRANTED IN PART**. Plaintiff's bad faith claim will proceed to trial, and Plaintiff's punitive damages claim is dismissed.

Dated this 21st day of April, 2015.

_____
James A. Teilborg
Senior United States District Judge

---

[7] Although the Court finds *Demetrulias* to be applicable with regard to Plaintiff's bad faith claim, it does not find it applicable with regard to her claim for punitive damages. In *Demetrulias*, the plaintiff offered significantly more evidence to support her punitive damages claim than Plaintiff does here. In particular, the plaintiff in *Demetrulias* offered evidence that plaintiff's supervisor falsely told the IME physician that there was surveillance footage demonstrating Plaintiff's ability to work. *Demetrulias*, 917 F. Supp. 2d at 1011. Plaintiff here offers no similar evidence.

- 11 -